**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LORRAINE FEMINO** | : | |
| | : | |
| | : | |
| | : | |
| **VS.** | : | **Civil Action No. 05-019ML** |
| | : | |
| | : | |
| | : | |
| **NFA CORPORATION d/b/a HOPE GLOBAL, et al.** | : | |
| | : | |

**PLAINTIFFS LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

## Plaintiffs Statement of Undisputed Material Facts

Pursuant to Local Civil Rule 56.1 of the Local Civil Rules of the United States District for Rhode Island and Rule 56 of Federal Rules of Civil Procedure, plaintiff respectfully submits the following statement of material facts as to which there does not exist a genuine issue for trial:

**Table of Contents**

I. Plaintiffs Disability and Submissions for Disability Benefits............................2

A. Plaintiff is diagnosed with disabling fibromyalgia determined by physicians using the American College of Rheumatology 1990 criteria for the Classification of Fibromyalgia.................................................................... 2

B. Plaintiffs appeal to the termination of disability benefits on November 18, 2003...................................................................4

II. The Disability Plans before and after February 1, 1999....................................6

A. The ITT Hartford Disability Plan for NFA..........................................6

B. The Prudential Disability Plan for NFA ...........................................8

C. Differences between the Hartford Plan and the Prudential Plan.................9

D. 1995 SPD did not disclose material modifications to the disability benefit..10

III. Plaintiff did rely on the terms and conditions outlined in 1995 SPD................. 11

A. NFA used the Hartford Plan as an inducement for plaintiff to leave a job at Microfibres in 1995..........................................................................11

B. Plaintiff retained detailed knowledge of the Disability Plan 8 years after the initial employment interview in 1995..............................................15

C. Plaintiffs reliance on being timely informed of disability benefit changes...15

IV. NFA's failure to implement the Prudential Plan in accordance with a written instrument..............................................................................16

A. The 1999 plan amendment was completed by the HR Director with no record of authorization, ratification or a written amendment procedure....................16

B. NFA did not properly maintain records to verify compliance with the disclosure requirements ..........................................................................18

C. The HR Directors 1999 Memorandum to NFA Managers......................18

D. NFA's implementation of a change in plan providers from Hartford Plan to Prudential Plan..................................................................................19

V. NFA Corp did not fulfill a statutory obligation to deliver requested plan documents to plaintiff. ................................................................................21

## I. Plaintiffs Disability and Submissions for Disability Benefits

### A. Plaintiff is diagnosed with disabling Fibromyalgia determined by physicians using the American College of Rheumatology 1990 criteria for the Classification of Fibromyalgia.

1. The combined medical evidence submitted by Plaintiffs primary care physician, Dr Keith Rafal, to the Social Security Administration supports a determination of a disabling medical impairment deemed to be a total where such medical impairment determination by the Social Security Administration was based primarily on the disability from

Fibromyalgia (Exhibit 1 Plaintiff Lorraine Femino Deposition (hereinafter ex plaintiff Depo) p 46 at 2-25)

2. Plaintiff is also diagnosed with Carpal Tunnel Syndrome in both wrists where the combined and concurrent disabilities of Carpal Tunnel Syndrome and Fibromyalgia have substantially limited plaintiffs use of hands (Plaintiffs Exhibit 2, Prudential denial of appeal letter, March 1, 2004, (hereinafter ex 2 Pru Appeal Denial) page 2 at "Claim Summary".)

3. Plaintiffs disability determination by the Social Security Administratiorn was based on all the medical evidence in file which includes medical evidence of Fibromyalgia and Carpal Tunnel Syndrome and approved without a hearing or denial on the first submission. (ex Plaintiff Depo p 45 at 8-25).

4. Social Security Ruling 99-2p (hereinafter SSR-99-2p) holds that "Individuals with impairments that fulfill the American College of Rheumatology criteria for [Fibromyalgia] (which includes a minimum number of tender points) may also fulfill the criteria for CFS". (Plaintiffs Exhibit 3 Social Security Ruling 99-2p page 8 at 3)

5. SSR-99-2p requires a finding of "severe" impairment when "symptoms are found to cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basic work activities." (Plaintiffs Exhibit 3 Social Security Ruling 99-2p page 4 at 2)

6. The Social Security Administration did determine Plaintiff became eligible for disability payments on May 23, 2001 and Plaintiff remains disabled as determined by the Social Security Administration to the present. (Plaintiffs Exhibit 4, Social Security letter December 15, 2005 approving continuing benefits)

7. The NFA disability plan provider, Prudential Insurance Company of American (hereinafter Prudential) did recognize plaintiffs medical impairment for both Fibromyalgia and Carpal Tunnel Syndrome and did pay benefits for both disabilities during a 24 month period between November 2001 and November 2003, but did keep both determinations separated in time in spite of their concurrency. (Plaintiffs Exhibit 5, November 24, 2003 Prudential termination of benefits letter, page 2 ¶ 5)

8. Pertaining to plaintiffs disability ruling by Prudential approving plan benefits for Fibromyalgia, Prudential stated "We have determined that your condition of Fibromyalgia and related impairment currently support Total Disability.... Therefore benefits are being paid solely on your impairment and diagnosis of Fibromyalgia". (Plaintiffs Exhibit 6 April 15, 2003 letter from Prudential page 2 at "Information Regarding Your Claim").

**B. Plaintiffs appeal to the termination of disability benefits on November 18, 2003**

9. Plaintiff did appeal the termination of disability benefits in November 2003 citing the combined symptoms of Fibromyalgia and Carpal Tunnel Syndrome and received a denial of appeal dated March 01, 2004. (ex 2 Pru Appeal Denial page 1¶ 1).

10. Prudential stated the denial of Plaintiffs appeal to the termination of benefits beyond 24 months was based on the terms of the NFA Long Term Group Disability Benefit contract where such terms and conditions held "Fibromyalgia was subject to the Self Reported Symptoms Limitation with the benefit period ending on November 18, 2003". (ex 2 Pru Appeal Denial page 1at "Claim Summary" ¶ 2).

11. In Prudential's denial of appeal letter, Prudential did provide a closing statement on plaintiffs continuing combined symptoms from Fibromyalgia and Carpal Tunnel Syndrome confirming the absence of all medical evidence for Fibromyalgia in the continuing review stating "We recognize that you may be experiencing continued pain related to Fibromyalgia and this may be complicating the pain experience from your Carpal Tunnel Syndrome, however as you have reached your benefit limitation for Self Reported Symptoms effective November 18, 2003, a decision beyond that date must be made on the objective evidence in file" (ex 2 Pru Appeal Denial page 3 at ¶ 2).

12. Following the denial of appeal, plaintiff did submit multiple requests for plan documents from Prudential on the plan policies of excluding all medical evidence from Fibromyalgia from all disability reviews, but did not receive any response from Prudential other than verbal confirmation of such policies. Plaintiff did finally submit a letter to Prudential stating the policies of excluding all medical evidence understood by Plaintiff as being enforced by Prudential, but did not receive any response to this letter. (Plaintiffs Exhibit 7, Plaintiffs January 20, 2005 Letter to Prudential).

13. Plaintiff did appeal to NFA via Counsel for the NFA Plan Administrator, Bruce Barth, and the NFA Director of Human Resources, Dorothy Mattiello (hereinafter HR Director) a confirmation that Prudential's exclusion of all of Plaintiffs medical evidence pertaining to Fibromyalgia was a valid enforcement of terms and conditions of the NFA Disability Benefit plan contract. Plaintiff received no response from any person from NFA on this request for information. (Second Amended Complaint p 16 ¶¶ 6-7) and (Plaintiffs Exhibit 8 Supplementation of Disclosures and Response.)

## II. The Disability Plans before and after February 1, 1999

### A. The ITT Hartford Disability Plan for NFA

14. The disability plan for NFA Corporation provided by Hartford Life and Accident Insurance Company (hereinafter the Hartford Plan) from 1994 until 1999 was an ERISA defined benefit plan known under the Group Insurance Policy GLT-205544 providing "income protection if you become disabled from a covered accidental bodily injury, sickness or pregnancy" (Plaintiffs Exhibit 9, Hartford Plan - Summary Plan Description (hereinafter ex 1995 SPD), page 3).

15. The Hartford Plan "Plan Sponsor" and "Plan Administrator" was NFA Corporation. (ex 1995 SPD p 31).

16. The Hartford Plan Name was "Group Long Term Disability Benefits for Employees of NFA Corporation." (ex 1995 SPD p 31).

17. 1995 SPD did not contain on any page a stated procedure by which the Hartford Plan could be amended where such disclosure is a requirement under 29 U.S.C. 1102. (ex 1995 SPD).

18. 1995 SPD did not contain on any page in the SPD the name of any person(s) with authorization to amend the Hartford Plan where such disclosure is a requirement under 29 U.S.C. § 1102. .(ex 1995 SPD).

19. 1995 SPD did not contain on any page in the name of any person(s) who are named fiduciaries where such disclosure is a requirement under 29 U.S.C. § 1102. (ex 1995 SPD).

20. The Hartford Plan does not contain on any page in the SPD an SRS rule or any similar rule by which reliable medical evidence submitted by a physician is not credited into a disability review where the physician did use procedures and clinical examinations standardly accepted in the practice of medicine. (ex 1995 SPD).

21. With respect to the Hartford Plan, 2 classes of employees are established where Class 1 is a full time employee with an annual salary of more than $30,000 per year and Class 2 is a full time employee with an annual salary less than $30,000 per year (ex 1995 SPD p 3).

22. Plaintiff was a full time employee making less than $30,000 per year and thus under the plan, defined as a Class 2 employee. (Plaintiff Depo p 22 at 25).

23. With respect to a Class 2 employee under the Hartford Plan, monthly benefits are calculated as being 60% of the Monthly Rate of Basic Earnings (1995 SPD p 3) defined as "the rate in effect on your last day as an Active Full Time Employee before becoming Totally Disabled" (ex 1995 SPD, p 6).

24. Monthly benefit payments made from the Hartford Plan for a Class 2 employee are reduced by the amount of Social Security Administration benefits paid as a result of the disability. (ex 1995 SPD p7).

25. The plan prominently uses the term "Long Term Disability" on the cover, in the plan name, and in numerous places throughout 1995 SPD to describe benefit protections.

26. The Hartford Plan costs were $ 1.47/per $100 for the period forward of 1999. (Plaintiffs Exhibit 10 "Memorandum" of HR Director (hereinafter Memorandum) ¶ 1).

27. NFA paid a portion of the cost of the premium on behalf of employees as a benefit of employment. (ex 1995 SPD p32 at 8)

**B. Prudential Insurance Disability plan**

28. The disability plan for NFA Corporation provided by Prudential is described in the Prudential Plan Summary Plan Description (hereinafter 1999 SPD) as being an ERISA defined benefit plan known under the Group Insurance Policy GLT-205544 effective February 1, 1999 providing "Employee Long Term Disability coverages" (Plaintiffs Exhibit 11 Prudential Plan Summary Plan Description (hereinafter 1999 SPD), page 33).

29. The name of the Prudential Plan is the "NFA Corporation Employee Long Term Disability Coverages for all Employees." (ex 1999 SPD, page 33.)

30. Prudential Plan provides coverages for a single defined class of employee being "all full time Office Staff, Executives, and Clerical" (ex 1999 SPD, page 9.)

31. NFA did not share in any premium cost for the Prudential Plan. (ex 1999 SPD, page 9.)

32. A covered disability under the Prudential Plan includes a sickness that is "any disorder of the body or mind" (ex 1999 SPD p 10.)

33. The Prudential Plan contains a plan rule called the "Self Reported Symptoms" rule (hereinafter SRS rule.) The self reported symptoms rule holds that self reported symptoms do not include "manifestations of your condition , which you tell your doctor, that are … verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine". (ex 1999 SPD p 18.)

34. Monthly benefit payments made from the Prudential Plan for a plan participant are reduced by the amount of Social Security Administration benefits paid as a result of the disability. (ex 1995 SPD p7).

35. The Prudential Plan prominently uses the term "Long Term Disability" on the cover, in the plan name, and in numerous places throughout 1999 SPD to describe benefit protections. (ex 1999 SPD)

36. The Prudential Plan premium costs relative to the Hartford Plan and forward from February 1, 1999 were $ 0.43/per $100 (ex Memorandum ¶ 1).

37. The Prudential Plan does not recognize medical evidence determined by a physician using the American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia as being "objective" and such medical evidence was excluded from plaintiffs disability reviews. (Plaintiffs Exhibit 6 page 3 ¶ 2.)

**C. Differences between the Hartford Plan and the Prudential Plan.**

38. Prudential does enforce contractual policies not documented in 1999 SPD, but contained in the Plan Document, where under the SRS rule, reliable medical evidence submitted from a physician pertaining to a disability from Fibromyalgia is automatically excluded from all disability reviews and where Prudential held on Plaintiffs claim "as your claim was payable for Fibromyalgia, your claim is subject to the Self Reported Symptoms limitation" and that all medical evidence pertaining to Fibromyalgia is not "objective". (Plaintiffs Exhibit 5, November 24, 2003 Prudential termination of benefits letter, page 2 ¶ 5) and (ex 2 Pru Appeal Denial page 2 ¶ 2 and p3 ¶ 2).

39. The Hartford Plan does not contain any automatic exclusionary contractual policies applied against specific disabilities which has the purpose of excluding from all disability

reviews medical evidence submitted by a physician pertaining to those specific disabilities. (ex 1995 SPD).

40. Forward of 1999, The Hartford Plan premium costs were 240% higher than premium costs offered by the Prudential Plan. (ex Memorandum)

41. 1995 SPD did not contain a disclosure or procedure by which the plan could be amended nor identify persons authorized to amend the Hartford Plan. (ex 1995 SPD)

42. Hartford plan was subsidized by NFA on behalf of employees, Prudential Plan was 100% employee funded. (1999 SPD p 9)

**D. 1995 SPD did not disclose material modifications to the disability benefit.**

43. The plan language in 1999 SPD does not state circumstances where medical evidence determined by a Rheumatologist using the American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia cannot be applied against another concurrent medical impairment as being contributing evidence of a medical impairment. (ex 1999 SPD)

44. The plan language in 1999 SPD does not state circumstances where all medical evidence of a medical impairment determined a Rheumatologist using the American College of Rheumatology 1990 Criteria for the Classification of Fibromyalgia is not objective medical evidence. (Second Am. Compl. at 10 ¶ 35.)

45. The plan language of 1999 SPD prominently uses the term Long Term Disability plan on the cover in the plan name and throughout the document in a similar manner as

was used in 1995 SPD to mean coverage for a "sickness" that lasts beyond 24 months.(1995 SPD comparison to 1999 SPD)

**III. Plaintiff did rely on the terms and conditions outlined in 1995 SPD**

**A. NFA used the Hartford Plan as an inducement for plaintiff to leave a job at Microfibres in 1995.**

46. NFA d/b/a Hope Global prior to a time around 1999 was known as NFA d/b/a Hope Webbing (hereinafter Hope Webbing). (Plaintiffs Exhibit 12, Deposition of Roger Morris, Hope Webbing Director of Personnel (hereinafter Morris Depo) p 5 at 16-17)

47. In late 1994, Hope Webbing was located in Pawtucket Rhode Island and finalizing plans to move to a new company headquarters located at 50 Martin Street, Cumberland Rhode Island. ( Plaintiff Depo p 28 at 20-22)

48. In December 1994, at the annual Hope Webbing Christmas Party, the President of Hope Webbing, Bruce Hauser, had a discussion with a Hope Webbing employee, Jill Bibby, about problems finding a good candidate to work the reception area at the new Hope Webbing corporate headquarters which was scheduled to open in several months. (Plaintiff Depo p 28 at 16-20)

49. Jill Bibby who had previously worked for, Microfibres, informed Bruce Hauser of a candidate who would be perfect for the job, being plaintiff, who was still working at Micofibres. (Plaintiff Depo p 28 at 23-25)

50. Bruce Hauser was looking for a specific image and capabilities to manage clients and important people visiting the Hope Webbing headquarters in Cumberland Rhode Island and indicated to Jill Bibby "how do we get her here". (Plaintiff Depo p 28 at 23-24)

51. At a time just before Christmas 1994, plaintiff did receive a call from Jill Bibby who did tell plaintiff of the conversation with Bruce Hauser at the Christmas party explaining that Bruce Hauser needed a good receptionist at the new company headquarters in Cumberland Rhode Island wanted to know what would it take to get Plaintiff to come to Hope Webbing. (Plaintiff Depo p 28 at 24-25)

52. Plaintiff told Jill Bibby that plaintiff had no interest in leaving Microfibres since it would be a lateral change and plaintiff was happy at Microfibres. (Plaintiff Depo p 29 at 1-3)

53. During the week between Christmas and New Years 1994, Plaintiff, received a telephone call from Bruce Hauser at plaintiffs home inquiring about an interest to come to Hope Global as the receptionist. Plaintiff spent about 10 minutes on this call and agreed to meet with Bruce Hauser after New Year and discuss the position. (Plaintiff Depo p 29-30)

54. In the week immediately following the New Years holiday, plaintiff did meet with Bruce Hauser who did explain the scope of the receptionist position at Hope Webbing and did speak about the excellent benefits package at Hope Webbing which did include a disability plan partly paid by the company. (Plaintiff Depo p 29 at 1-3.)

55. Plaintiff was not provided details of the benefits at Hope Global during the meeting with Bruce Hauser, but Plaintiff did interpret Bruce Hauser's general description of an

NFA disability benefit plan to be a full coverage benefit providing benefit protections from a sickness until age 65. (Plaintiff Depo p 32 at 1-16)

56. At this meeting, plaintiff was also later introduced to Rachael Pacheco the Vice President of Hope Webbing to discuss other general matters of coming to work at Hope Webbing. Plaintiff did not meet with any other person that day. (Plaintiff Depo p 30 at 10-14)

57. Plaintiff ended the meeting with no decision to make a job change primarily because plaintiff was scheduled for surgery in the following week and would be out of work for a period of time. (Plaintiff Depo p 31 at 1)

58. Plaintiff did leave work for scheduled surgery the following week and remained at home in recovery for a period of six weeks beginning in the second week of January, 1995. While plaintiff was recovering at home, plaintiff received calls from Bruce Hauser and Rachael Pacheco inquiring on plaintiffs health and if plaintiff had decided to come to work at Hope Webbing. (Plaintiff Depo p 30 at 24-25)

59. In the fifth week of recovery, plaintiff did inform Bruce Hauser that plaintiff would be taking the job with Hope Webbing. (Plaintiff Depo p 31 at 1-2)

60. Bruce Hauser set up a meeting with the Hope Webbing Personnel Director, Roger Morris (hereinafter Personnel Director) in the following week to go over the benefits and complete an employee intake interview. (Plaintiff Depo p 34 at 4-11)

61. Plaintiff did not give any notice of a job change to Microfibres before the meeting with the Personnel Director (Plaintiff Depo p 34 at 6-7)

62. In the sixth and final week of Plaintiffs disability recovery, plaintiff did meet with the Personnel Director to discuss the benefits package. Plaintiff did ask the Personnel Director questions of the disability plan to confirm coverages. (Plaintiff Depo p 35 at 1-3)

63. The Personnel Director did confirm "exactly what it would be that I would be getting" which included that the Hartford Plan did provide coverages if plaintiff got sick until age 65 and that the plan was a good disability benefit since NFA paid for a portion of the premiums for employees. (Plaintiff Depo p 35 at 24-25 and p 34 at 3-4)

64. The Personnel Director confirms he remembers meeting with plaintiff in 1995 for an employee intake interview. (Morris Depo p 6 at 19-22)

65. The Personnel Director confirms that he knew the Hartford Plan and would have discussed it with a new employee during an intake interview. (Morris Depo p 7-12).

66. Plaintiff did subsequently give Microfibres notice of taking another job on the Monday returning from recovery and did give a 3 week notice and did begin working at Hope Webbing at a time in March 1995 (Plaintiff Depo p 34 at 11)

67. Plaintiff believed that the senior executive of Hope Webbing, Bruce Hauser, sought out plaintiff to fill an important position at Hope Webbing, and therefore Plaintiff was brought in under special circumstances with a specific Disability Benefits Plan as described in 1995 SPD being part of plaintiffs total compensation package. (Plaintiff Depo p 3 at 16-19)

68. Plaintiff did not at any time fill out an application for employment in the process of being employed by Hope Webbing, or at any time after plaintiff was hired by Hope Webbing or Hope Global. (Plaintiff Depo p 34 at 12-16)

**B. Plaintiff retained detailed knowledge of the Disability Plan 8 years after the initial employment interview in 1995.**

69. Plaintiff has recollection of the terms and conditions of 1995 SPD having a recollection of reading the plan document at the time of employment in 1995. (Plaintiffs Depo p 37 at 11-24)

70. Plaintiff did retain a clear understanding of the terms and conditions of the Hartford Plan even without being able to find a copy of the plan document in 2004 as demonstrated in a letter to the HR Director dated November 22, 2004, where plaintiff correctly states "a change in how medical evidence has become time limited in the current plan represents a clear benefit reduction from the old plan which had no similar limitations". (Plaintiff Exhibit 13 November 22, 2004 Letter to Dorothy Mattiello)

71. Plaintiff received no information at work that the Hartford Plan was changed in 1999. (Plaintiffs depo p 36 at 8-25)

72. Plaintiff received no timely information in the mail that the Hartford Plan was changed in 1999. (Plaintiffs Depo p 52 at 3-10)

**C. Plaintiffs reliance on being timely informed if the disability benefit changed.**

73. Plaintiff did make a job change from Microfibres to Hope Webbing in 1995 solely on the promise of a specific disability benefit plan with the specific plan terms as defined under 1995 SPD. (Plaintiff Depo p 30 at 19-21)

74. Plaintiff was a single parent who did depend on full protections from a Disability Welfare Benefit plan as was provided under Hartford Plan. (Plaintiff Depo p 24 at 22)

75. Plaintiffs understanding of the specific terms and conditions of the Hartford Plan came from promises of a specific benefit plan made by the President of Hope Webbing,

Bruce Hauser, in December 1994 and 1995 for plaintiff making a job change where specific terms and conditions of Hartford Plan were later confirmed by the Hope Webbing Personnel Director, Roger Morris in February 1995 in the initial employee intake interview. (Plaintiff Depo p 32 at 3-16)

76. Plaintiff believed that plaintiffs employment was under special circumstances where the specific benefit package was part of a total compensation package as a result of making a job change from Microfibres to Hope Webbing in 1995. (Plaintiff Depo p 3 at 16-19.)

77. Plaintiffs understanding of the NFA Disability Welfare Benefit was the Hartford Plan providing full disability coverages defined by 1995 SPD where NFA did provide part of the costs of the plan and employees provided the remaining costs. (Plaintiff Depo p 35 at 24-25 and p 34 at 3-4)

78. Plaintiff had no knowledge that the plan was materially changed in 1999 as a result of a change in plan carriers to Prudential. (Plaintiffs Depo p 52 at 3-25 and p 53 at 1-17)

## IV. NFA's failure to implement the Prudential Plan in accordance with a written instrument

### A. The 1999 plan amendment was completed by the HR Director with no record of proper authorization or ratification of the amendment

79. Prior to February 1, 1999, there did not exist a written instrument in the NFA disability plan defining an plan amendment procedure, identification of persons with

authority to amend the plan, or named fiduciaries with responsibilities to carry out fiduciary obligations under the plan. (ex 1995 SPD)

80. Prior to February 1, 1999, there did not exist any plan document disclosing NFA's right to amend the plan. (ex 1995 SPD)

81. There exists no dated written record at NFA documenting the events of the 1999 change in plan providers for the NFA Disability Welfare Benefit Plan. In the hearing on January 25, 2006 conducted by Magistrate Judge Lincoln Almond, the Court instructed NFA to provide plaintiff with minutes of meetings pertaining to the 1999 plan amendment which NFA agreed to do in the hearing. In a subsequent conference with Counsel for NFA, plaintiff was informed that the only written record of the 1999 change in plan providers was an undated internal "Memorandum" written by the HR Director to NFA Managers which had been previously provided to plaintiff. (Hearing on January 25, 2006 with all parties)

82. There exists no record of any authorized person(s) at NFA who did manifest a specific resolution to make material reductions in plan coverages to the NFA Disability Welfare Benefit.

83. There exists no record of any authorized person(s) at NFA who did delegate authority to the Director of Human Resources to carry out specific plan changes to the disability plan that would result in material reductions in plan coverages.

84. There exists no record that any authorized person(s) did receive material facts that a change in plans from the Hartford Plan to the Prudential Plan would result in material reductions in coverages for plan participants to counter the premise held in the "memorandum" that the plan designs were "the same". (ex Memorandum)

85. There exists no record that authorized persons did ratify any specific resolution(s) to the disability welfare benefit plan which did include material reductions in plan coverages.

**B. NFA did not properly maintain records to verify compliance with the disclosure requirements.**

86. There exists no written records of specific actions to distribute 1999 SPD to plan participants in a mass mailing at a time around 1999.

87. There exists no written records of information provided at any company meeting which describes statutory required disclosures in material reductions in plan coverages resulting from the 1999 change in plan providers.

88. NFA did not comply with the statutory requirement to keep important plan records "readily available" at the principal office of the plan administrator and in other relevant locations. (Plaintiffs Exhibit 14 "Defendants Responses to Plaintiffs Request for Production of Documents at "Response 1)

**C. The HR Directors 1999 Memorandum to NFA Managers**

89. NFA's broker Segwick Noble Lowndes solicited six quotes from vendors on behalf of NFA. (ex Memorandum ¶ 4)

90. The HR director defines the most "competitive quote" as being from "Prudential". (ex Memorandum ¶ 1)

91. The Memorandum states that the plan design between the Prudential plan and the Hartford Plan were the "the same". (ex Memorandum ¶ 4)

92. The Memorandum states that the difference in premium costs between the Prudential plan and the Hartford Plan after February 1, 1999 was $1.47/$100 for the Hartford Plan and $.43/$100 for the Prudential Plan. (ex Memorandum ¶ 1)

93. The memorandum states that the HR Manager had in 1999 the "contract terms and conditions governing [1999] LTD plan" (ex Memorandum ¶ 4)

94. The Memorandum contains no reference to any examination of a comparison of coverages beyond an assumption that the plan designs were the same. (ex Memorandum ¶ 3)

**D. NFA's implementation of a change in plan providers from Hartford Plan to Prudential.**

95. The HR Director did work with an outside consultant in 1998 being Segwick Noble Lowndes, to find a less expensive disability plan to replace the then current Hartford (ex Memorandum ¶ 1)

96. The HR Director did find a less expensive plan offered by Prudential that was implemented on February 1, 1999 as an ERISA plan that became 100% funded by plan participants thus eliminating all of NFA's contributions. (ex 1999 SPD p 9)

97. In the only NFA written document to senior NFA managers produced through discovery in this litigation, the HR Director states an assumption that the plan designs are "the same". (ex Memorandum ¶ 1)

98. In November 1998, during the competitive bidding, a representative from The Hartford alerted the Director of Human Resources, Dorothy Mattiello that based on the scope of services from the Hartford Plan and the quote for those services "It doesn't look

like we are going to get any way near what you are getting in from other carriers". (Plaintiffs Exhibit 15 Fax from Melanie Fava at The Hartford)

99. There exists no document or testimony produced in discovery from NFA that any fiduciary effort was made by any person to account for the substantial difference in premium costs between Hartford Plan and Prudential plan as such cost differences would impact coverages for plan participants.

100. Plaintiff had no memory of any NFA company meeting to discuss the Prudential Plan but did remember attending a 401 K meeting in 1999. Plaintiff did contact former employees of NFA to check if any other person remember Prudential Plan meetings in 1999. Of 4 employees plaintiff spoke with, none remembered hearing of a meeting or receiving information of any meeting. Plaintiff did provide the names of all persons plaintiff spoke with and all were deposed by NFA on this matter. (Plaintiff Depo p 52 at 11-21) and

101. Other former employees do not recall attending meetings or receiving documents pertaining to the change in change in Disability plan providers in 1999 but do remember 401K meetings being held. (Plaintiffs Exhibit 16, Deposition of Denise Rheaul Page 9 at 5-25 and page 12 at 25 and page 13 at ) and (Plaintiffs Exhibit 17, Deposition of Theodore Dziedzic page 5 at 25 and page 6 at 1-8)

102 Plaintiff did not receive an SPD on Prudential Plan until a time around 2002 (plaintiff Depo p 52 at 3-10.)

103 Plaintiff did not attend any meetings or receive notice of any meetings pertaining to the Prudential Plan at any time around 1999 (Plaintiffs Depo p 50-51 at 17-25 and 1-13.)

## VI. NFA Corp did not fulfill a statutory obligation to deliver requested plan documents to plaintiff.

104. Plaintiff did not receive requested plan documents due to NFA's failure to maintain documents at the office of the plan administrator (Plaintiffs Exhibit 13 "Defendants Responses to Plaintiffs Request for Production of Documents at "Response 1 and 2")

105. NFA did not provide a requested copy of 1995 SPD in a timely manner with a first refusal of plaintiffs request for 1995 SPD dated December 10, 2004 and followed by a second refusal dated December 17, 2004 (Plaintiffs Exhibit 18 Letter to Plaintiff from Bruce Barth, Counsel for the Plan Administrator, dated December 17, 2005)

106. NFA admits to having in their possession a copy of 1995 SPD since November 22, 2004, but chose not to provide 1995 SPD until June 16, 2005 (Plaintiffs Exhibit 19 Defendants Responses to Plaintiffs First Request for Admission, Response 1)

107. NFA had, through Counsel Bruce Barth, a copy of US Department of Labor "Mario Amicus Brief" provided by Plaintiff at a time around January 5, 2005 which states "if a participant wants information beyond that required in the SPD, including information on the administrators discretion, the participant can obtain it". (Plaintiffs Exhibit 20 Mario Amicus Brief page 2)

108. NFA did successfully argue in this litigation in the matter of plaintiffs request for 1995 SPD, that the NFA central location to obtain plan documents is the office of the Plan Administrator as noted on Page 33 of 1999 SPD being: NFA Corporation, 850 Boylston Street, Boston, Ma. 02199 (Hearing before Magistrate Judge Lincoln Almond, April 6, 2005.)

109. Plaintiff's specific disability and associated flare-ups (emph added) are made worse by any stress which includes all stress from this litigation. (Plaintiffs Depo p 48 at 11-22)

Respectfully submitted

Lorraine Femino

Lorraine Femino, Pro Se
4 Bayou Drive
Greenville, R.I. 02828
(401)-949-4933

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing document was served by United States Postal Mail, postage prepaid on this 26th day of April, 2006 to:

William E. O'Gara, Counsel for Defendants
One Financial Plaza, Suite 1800
Providence, RI 02903

Lorraine Femino

Lorraine Femino, Plaintiff, Pro Se
4 Bayou Drive
Greenville, R.I. 02828
(401) 949-4933