FOR THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Lorraine Femino :
:
VS. : C.A. NO.: 05-019ML
:
NFA Corporation, d/b/a Hope :
Global and Dorothy Mattiello :
In her Capacity as Hope Global:
Human Resources Vice President:
And NFA Corporation and Bruce :
Barth in his Capacity as :
Attorney for NFA Corporation :

DEPOSITION OF LORRAINE FEMINO, the Plaintiff in the above-entitled cause, taken on behalf of the Defendants, before Elizabeth Greeley, Notary Public, in and for the State of Rhode Island, at the offices of Holland and Knight, One Financial Plaza, Providence, Rhode Island, on December 19, 2005 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF.........BY: LORRAINE FEMINO, PRO SE
FOR THE DEFENDANTS........HOLLAND & KNIGHT
BY: WILLIAM O'GARA, ESQUIRE

ALSO PRESENT:
KRISTEN ARESON
DOROTHY MATTIELLO

PLAINTIFF EXHIBIT #1

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920

A. I'll do my very best. If I don't understand anything, I will just take a few minutes and sometimes my brain will go into, it just shuts down.
Q. Okay. I will do my best to ask questions slowly, and I will give you whatever time you need to answer the question.
A. If I get confused, if you would prefer, after this deposition, if you want to give me a, I'll get a copy of it and can clarify things better, if that's acceptable to you. I'll be happy to do that. If not, I'll do my very best.
Q. The only thing I can ask you to do is to do your best. You have your daughter here today with you, right?
A. There may be times if I fall into a shutdown, she may tap me and say, you know --
Q. That's fine. That's fine. Are you taking any medication right now that affects your ability to sit for this deposition?
A. Yes, I am.
Q. What are you taking for medication?
A. I'm taking OxyContin. I'm on 50 milligrams of OxyContin.
Q. As we discussed, we're going to suspend this deposition at noontime today?

A. I don't know. I think she was there after. I can't say.
Q. How about Linda Scandriatto?
A. I believe she left before 1999.
Q. So you spoke to Linda?
A. I spoke to Linda Haddock.
Q. That's what I meant. You spoke to Linda Haddock. Did you appeal the denial of benefits?
A. Yes, I did.
Q. Just so the record is clear, that was an appeal that went internally to Prudential, correct?
A. Yes.
Q. Did you submit any more documentation in connection with the --
A. Appeal?
Q. Yes.
A. Yes, I did. I submitted -- at that time, again, I was going through more testing. I submitted the test from the carpal tunnel. Ultimately I believe it was in April or May of that year. I'm not sure if it's 2001 or 2002. It's in my correspondence. That's when I was, that's when they gave me the benefits.
Q. At the time you left Hope Global, how much were you earning a week, approximately?
A. It was about $22,000 or $23,000 a year.

that you left to work for Hope, if you recall?
A. I don't even think it was $20,000 a year.
Q. How was it that you came to be employed by Hope?
A. Okay. While I was working at Microfibres a friend of mine worked there as well. Her name was Jill Bibby. Jill went over to Hope. Actually, Linda Scandriatto worked at Microfibres as well. Linda went, had first worked at Hope then went to Microfibres, then went back to Hope. Then Jill Bibby worked with me at Microfibres.
Q. Was she in purchasing with you at Microfibres?
A. No, she was in customer service.
Q. Okay. Jill went to Hope?
A. Hope.
Q. How was it that you ended up at Hope?
A. There was a Christmas party. I believe it was 1994. They had their Christmas parties at the Kirkbrae Country Club. Jill happened to be talking to Bruce Hauser who was the president of the company at the time. They were, the company was going to be moving over to Cumberland. They were in Pawtucket. They were going over to a newer office in Cumberland. Jill mentioned to Bruce about me. He said, "How do we get her here?" That week I had gotten a phone call from Jill, said that Bruce, she talked to Bruce and he

was interested in having me go over to Hope. I was, again, still at Microfibres, very happy doing what I was doing there. I did not respond to that.

Shortly thereafter I received a phone call from Bruce Hauser at my home asking me if I would go in to talk to him, and I did. I gave him the courtesy to go in and talk to him. They were still in the Pawtucket office at the time. I hadn't made any decisions about moving yet. He mentioned the disability welfare benefit. He mentioned the 401(k), said that he would very much like me to work for his company.

Q. All right. I don't want to interrupt you. Let me ask you a couple of follow-up questions.
Mr. Hauser contacted, he called you at home?

A. Yes, he did.

Q. Did he discuss with you a particular position with the company?

A. Yes, my position.

Q. Which was?

A. Receptionist.

Q. At the time that Mr. Hauser contacted you, you were working as a receptionist at Microfibres?

A. Yes, I was.

Q. How long, this conversation where Mr. Hauser called you at home, was this a five-minute telephone

call, a ten-minute telephone call, how long was this conversation?

A. Just about a ten-minute phone call.

Q. Then you, you made an appointment to meet with him?

A. Yes, I did.

Q. Was anyone else in attendance at this meeting?

A. Mr. Hauser was, but then he introduced me to the vice president who was Rachel Pacheco.

Q. Was Rachel Pacheco, was she in attendance at this meeting?

A. No. I spoke with Bruce Hauser first, and then I spoke with Rachel Pacheco after that individually.

Q. When you spoke with Bruce Hauser, did you have any discussion as to what you would be paid if you came to work for the company?

A. He told me he could give me a little bit more than what I was making, not much. What was the triggering factor was the benefit plan, because it was important to me because I was going out on surgery. I had mentioned that I have had surgery. I had to have foot surgery. So it was on my mind. I went for the foot surgery. While I was recuperating from foot surgery, Bruce Hauser and Rachel Pacheco called me

different times, asked me if I would, you know, go over. I made my decision that yes, I would.
Q. How about your friend Jill Bibby, did she call you as well?
A. Yes.
Q. Do you know where -- is Jill Bibby still living in the area?
A. I don't know. I lost contact with her when she left Hope.
Q. Her last name is spelled B-I-B-B-Y?
A. Yes.
Q. At the time that you were out of work in connection with the foot surgery, you were receiving TDI benefits?
A. Yes.
Q. Had you over the course of your work life, had you received TDI benefits on different occasions?
A. I had been having back problems.
Q. To the extent that you were out of work for longer than a week, would you receive TDI benefits?
A. Yes.
Q. In connection with the foot surgery, you understood that that would be a short-term disability where you would receive benefits, right?
A. Yes.

Q. Other than mentioning that Hope offered a 401 (k) and offered a long-term disability plan, did you have any discussions regarding the specifics of either the 401 (k) or the long-term disability benefits plan with Mr. Hauser?

A. He just explained to me that that's what they offer. It was, he asked me if I had them at Microfibres. I said no.

Q. Other than just saying the company offers a 401(k) and a long-term disability policy, I take from your answer he didn't get into kind of the details of either plan at that point?

A. No, because he was setting up an appointment with Roger Morse who was then the personnel director and told me that he would explain everything in detail to me.

Q. When you -- and there came a point in time where you met with Mr. Morse, correct?

A. Yes, yes.

Q. At the time that you met with Mr. Morse, had you already accepted the position?

A. Yes, I did.

Q. So you had made the decision to come to Hope Global before you sat down with Mr. Morse to go over the benefits package?

Q. What is Robert's date of birth?

A. January 2, 1977.

Q. You left the employment with the state in 1975 and you were home taking care of your daughter and your son?

A. Yes.

Q. Did there come a point where you went back to work?

A. Yes, I did. When the children were in elementary school, I worked part time for the Providence Hebrew Day School. Only during the hours that they were in school.

Q. What did you do there?

A. I was an administrative assistant to the director there. His name was Sam Schlevin.

Q. At the time -- when was this approximately that you worked for the school?

A. Probably in the early '80s.

Q. How long did you hold that position?

A. Just for a few years.

Q. Where did you go next as far as employment?

A. During that time I was divorced.

Q. Okay. When you say during that time, this would be the early 1980s?

A. I was divorced in '85.

A. Yes, yes.
Q. When you met with Mr. Morse, what did he tell you?
A. He was reading something. I don't know what it was, but it looked like he was reading from a document explaining the benefit package to me. Again, I said it was important to me because I was recuperating from foot surgery. I knew that, I knew it was important.
Q. When you say he was reading from a document, tell me about this meeting. Where did this take place?
A. It took place in the Pawtucket office. The company had already moved to Cumberland. His department was still in the Pawtucket office. It hadn't moved over yet.
Q. What was your understanding as to what Mr. Morse's position was?
THE WITNESS: His work position?
MR. O'GARA: Yes.
A. He was the personnel director.
Q. You met with Mr. Morse at his office in Pawtucket, right?
A. Yes.
Q. You said he read from a, he appeared to be reading from a document?

A. Yes.
Q. Describe that for me.
A. Telling me that if anything happened to me, that I would be paid until normal retirement age.
Q. This meeting, when did this occur, approximately?
A. Three weeks, I believe, before I gave my notice at Microfibres. I wanted to give Microfibres enough notice.
Q. That would have been sometime in early 1995?
A. Yes, because I started, probably, in February 1995 because I started at Hope in March 1995.
Q. At the meeting with Mr. Morse, did you fill out an employment application at that time?
A. No, I didn't.
Q. When did you fill out an employment application?
A. I never filled out an employment application. I came in under special circumstances. I came in through Bruce Hauser and was never asked to fill out an employment application.
Q. The meeting, again, focussing on the meeting with Mr. Morse, did he have any discussion with you regarding the other benefits that the plan, the company offered?
A. The 401(k) plan.
Q. What did he tell you about that?

A. That I don't remember too well. I was focussing on the disability because I was coming off surgery.
Q. Had you ever, so for you the disability plan, you considered that to be a valuable benefit?
A. Yes, I did.
Q. Had you ever made any inquiry -- do you have an insurance agent that you use?
A. Allstate.
Q. Had you ever, is there a particular agent that you work with?
A. He's in Greenville. Donald Donborough, Donborough.
Q. Had you ever contacted -- strike that. You ever contact your insurance agent to inquire about the possibility of purchasing long-term disability coverage?
A. No, because I was going to be getting it from Hope.
Q. At the time that you met with Mr. Morse, did he provide you with any documentation describing the different benefits that you'd be receiving as an employee of the company?
A. He made me understand exactly what it would be that I would be getting.

Q. Let me see if you can focus on my question. Did he, when you started your employment with Hope Global, did Mr. Morse provide you with any documentation explaining the health benefit or the 401 (k) or long-term disability policy, did you receive any documents?

A. I'm sure I did, but I can't remember.

Q. Okay. Do you recall, and I take from your answer you do not, if I asked you to sit down and say okay, can you describe for me each and every document you received, you's not able to do that; is that a fair statement?

A. Yes.

Q. But you have a recollection of receiving some documentation from the company when you started your employment?

A. Yes.

Q. Do you have a recollection that the documentation included a description of the long-term disability plan?

A. I'm sure it would have.

Q. Do you recall if you reviewed that plan when you received it?

A. I'm sure I would have.

Q. Because, as you told me before, you felt that the

long-term disability plan, that that was an important benefit that you were going to receive from, as a result of working for Hope, correct?

A. Yes.

Q. In response to -- strike that. In connection with this case, I have provided you with a copy of that policy, correct?

A. Yes.

Q. Were you referring to that, and in the complaint that is referred to as SBD2?

A. Yes, because I had the one from Prudential.

Q. So the Prudential plan you had in your file. The prior plan, SBD2, you weren't able to locate that, correct?

A. Yes.

Q. But your recollection is that you reviewed that plan, SBD2, at the time you started your employment?

A. Yes.

Q. To your knowledge, were there any limitations in the plan, SBD2, that impacted the, your ability to receive benefits under that plan? Let me withdraw the question. When you started working for Hope, you received SBD2, correct?

A. Yes.

(DEFENDANTS' EXHIBIT A MARKED FOR ID)

(BRIEF RECESS)

Q. Other than your discussions with Mr. Cranshaw regarding possible employment at Pawtucket Mill Supply, were there any other employers that you investigated or approached you regarding employment during the time period that you worked for Hope?

A. No.

Q. You're receiving Social Security Disability benefits at this time, correct?

A. Yes.

Q. In order to receive Social Security benefits, did you have to go to a hearing?

A. No. I was never denied Social Security. I was accepted the first try.

Q. Did anyone assist you in preparing the documentation necessary to apply for Social Security Disability benefits?

A. No, I did that myself.

Q. You provided medical document in connection with the application?

A. Yes.

Q. What documentation did you provide in connection with the application?

A. Well, they needed all of my doctors' reports. I had been to several doctors, because they had to

rule out, they ruled out MS. They ruled out lupus. They ruled out so many diseases. I had to send all of that documentation into Social Security. I did. I was seen by their doctor as well.

Q. Do you recall who that was that saw you?

A. It was -- I don't remember.

Q. Did doctors that are treating you for fibromyalgia, did they provide reports in connection with your application for benefits?

A. Yes.

Q. When did you first begin receiving Social Security Disability benefits, to the best of your recollection?

A. It's been almost two years now. I would say about a year and-a-half.

Q. To your knowledge, was the basis of the award of Social Security Disability benefits the fibromyalgia?

A. Yes.

Q. It was not related to carpal tunnel?

A. Fibromyalgia.

Q. What is the benefit that you receive from Social Security Disability benefits?

A. It just went up. It was $830. Now it's $868.

Q. Do you have an understanding that Social Security

Q. Have any of the doctors that you treat with indicated to you that they expect your medical condition, your current medical condition to get better over time?

A. That's what we're trying for. I'm in, the doctor I'm working with, Dr. Rafal, his whole hospital is considered a rehabilitation hospital. I'm in what they would consider a rehabilitation program, physical therapy, occupational therapy, pool therapy, exercise, diet.

Q. Do you see Dr. Rafal on a monthly basis?

A. I see him on a monthly basis.

Q. Describe for me your physical condition during the course of a typical day.

A. Some days I'm in a flare-up and I cannot get out of bed. Other days I feel like it's just -- do you know what it feels like to have the flu?

Q. Yes.

A. Like that, all the time. Some days, the problems that I have with my back which I thought were back problems, I didn't realize it, but they were caused from the fibromyalgia.

Q. Has that, the condition that you just described for me, has that condition over the last 12 months improved; has it gotten worse; has it stayed the same?

A. It's gotten worse.

Q. What is the current course of treatment that you're receiving for the condition that you just described for me?

A. I'm on OxyContin. I take 50 milligrams of OxyContin in the morning. I take 40 milligrams of OxyContin in the afternoon -- I'm sorry, evening, rather. Every 12 hours. I use Lidoderm patches. I take Vicodin in between for pain. I'm on what they call a muscle stimulator. It's an electrode stimulator that you put on the pain, parts of your body. I use that three or four times a day. I don't drive anymore. Only to the market, if, you know, around my neighborhood. That's it. I have to rely on my daughter.

Q. Do you undergo any program of physical therapy or other treatment?

A. I was undergoing physical therapy, but I'm doing my exercises at home now. Diet control, food elimination, I'm using a lot of homeopathic methods.

Q. Has Dr. Rafal, has he indicated to you that he has a different course of treatment that he wishes to use or kind of where are you medically with your treatment with him?

A. I could go probably for, where they put the

pins in.
Q. Acupuncture?
A. Right. It's expensive. I can't afford it. It's not guaranteed, that's the thing.
Q. The medical treatment that you're receiving now, does Medicaid pay for that treatment?
A. I have what they call Medicare Complete. It's a senior Medicare.
Q. That's because you're receiving Disability benefits?
A. Yes.
Q. Let me shift gears again. We'll go back to your employment at Hope Global. Did there come a point in time in 1999 when you learned that the disability, long-term disability carrier for the company was going to be changed?
A. I don't remember being told that the long-term disability carrier was being changed.
Q. Do you recall there being meetings for the employees?
A. No. I remember 401(k) meetings.
Q. You don't, when you say you don't recall, are you telling me that you don't recall there being an announcement that there was a meeting relative to long-term disability, or are you testifying that there

was not an announcement regarding the long-term disability plan?

A. I never attended any meeting for long-term disability.

Q. As you sit here today, do you know if, in fact, meetings were held but you didn't attend them?

A. I don't believe meetings were held. It's my belief that meetings were not held, because I would have attended.

Q. So the fact that you didn't attend a meeting leads you to conclude that meetings were not, in fact, held?

A. That's correct.

Q. That's correct. All right.

A. I do not recall any announcement being made.

Q. How was it that you received a copy of SBD1?

A. The blue one?

Q. I'm sorry. Let me take two steps back. There came a point in time where you received a copy of the Prudential --

A. Okay, I called Ms. Mattiello. She sent it out to me.

Q. Prior to, sometime during 1999 when the carrier changed from Hartford to Prudential, copies of the plan summary and the booklet were distributed to

employees?
A. No.
Q. When was it that you first obtained a copy of the Prudential plan summary?
A. After I left, when I found out from Linda Haddock that the carrier changed.
Q. So it's your testimony that you don't recall receiving a planned document generated by the Prudential in 1999?
A. Correct.
Q. In connection with your case, you have contacted different former employees of Hope Global, correct?
A. Yes.
Q. What has been the reason that you contacted different employees of Hope Global?
A. I asked them if they remembered a meeting of any change in the disability plan.
Q. Okay. Who did you contact?
A. I contacted Denise Rowe, Todd Deizek, Duane Davis. I haven't given you his name. I don't have his address right now.
Q. I'm sorry, Duane?
A. Duane Davis, D-A-V-I-S.
Q. Where is he at?
A. He's in Cranston. I could get you his