UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Lorraine Femino :
:
VS. : C.A. NO.: 05-019ML
:
NFA Corporation, d/b/a Hope :
Global and Dorothy Mattiello :
In her Capacity as Hope :
Global Human Resources Vice :
President and NFA Corporation :
And Bruce Barth in his :
Capacity as Attorney for :
NFA Corporation :

DEPOSITION OF ROGER MORRIS, a Witness for the above-entitled cause, taken on behalf of the Defendants, before Elizabeth Greeley, Notary Public, in and for the State of Rhode Island, at the offices of Holland and Knight, One Financial Plaza, Providence, Rhode Island, on January 6, 2006 at 12:00 P.M.

PRESENT:
FOR THE DEFENDANTS...........HOLLAND & KNIGHT
BY: WILLIAM O'GARA, ESQUIRE

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920

PLAINTIFFS EXHIBIT #12

honestly, at that point in time I'm saying, "You're jogging my memory because it's a number of years ago."

Q. Understood. When did you, and prior to this conversation that you just described, when was the last time you had spoken to the Plaintiff?

A. Oh, it had to be years.

Q. Okay. What was the period of time that you were employed at Hope?

A. You know, I thought about that driving over, that you would ask me that. I went backwards. I know I left sometime probably in '95. I would say, again, I can find out, but I would think about '92 or '93 to '95. I was only there two or three years.

Q. At the time the company was Hope Webbing?

A. Right.

Q. Can you just describe for me what your job duties were with Hope Webbing?

A. I was titled, I think, the director of personnel, headed all the personnel, workers' comp, safety functions. The plant at that time was located over here in Pawtucket.

Q. On Main Street in Pawtucket?

A. Yes, yes.

Q. How many employees did you have at the time?

A. Oh, Christmas. If I don't remember how long

I was there -- I'd say 300, maybe.
Q. What was the nature of the business as far as what they manufactured?
A. It was like a manufacturer of woven fabrics, also some metal wiring and stuff like that, manufacturing.
Q. As director of personnel would you have interviewed every, was it your practice to interview every applicant for positions with the company?
A. It was my practice, but I'm not saying I necessarily did interview everyone. There were times I was doing something else, someone would come in. If it was a factory position or an office position, I mean, I just passed them on.
Q. Do you have a recollection of interviewing or -- strike that. Do you have a recollection of interviewing the Plaintiff in connection with her being hired by Hope Webbing?
A. I have a recollection that I did probably interview her briefly.
Q. Okay. Do you recall what you discussed during the interview?
A. No.
Q. With respect to the benefits offered by the company, at the time that you served as personnel

director would you have explained to a new employee the benefits offered by Hope?

A. I would have. I'm not necessarily saying I did with her, but I would have.

(DEFENDANTS' EXHIBIT 1 MARKED FOR ID)

Q. Mr. Morris, I'm showing you a document that has been marked as Defendants' Exhibit 1. You have that document in front of you?

A. Yes.

Q. Do you recognize that document?

A. Honestly, no, I don't. No.

(DEFENDANTS' EXHIBIT 2 MARKED FOR ID)

Q. I'm going to show you, Mr. Morris, what has been marked as Defendants' Exhibit 2. Do you recognize that document?

A. Yes. Well, I'm going to amend the answer. I don't recognize the document, but I recognize my writing on it.

Q. All right, good.

A. On the title.

Q. What is that document titled?

A. It's New Hire Information Sheet.

Q. Is that a document, that form of document, is that something that was used at Hope Webbing when you were the director of personnel?

A. Yes.
Q. Looking at the document, there's a list of various items; do you see that?
A. Yes.
Q. There are checkmarks that also appear on the document, is that your handwriting?
A. No, the checkmarks are not.
Q. Okay. Does that, how is it that you're able to identify the checkmarks as not being yours?
A. The first part of the document indicating name, clock number, department, that is distinctively my writing. Anything else on the rest of the document, I'm just looking, and probably the date at the bottom was put by me, but nothing else on there. The checks and signature are not mine.
Q. In looking at the document, is this -- obviously the Plaintiff's name appears on the document, right, and that's your handwriting?
A. Yes.
Q. New hire information, what was your practice as to when in the hiring practice you would prepare the document shown as Defendants' Exhibit 2?
A. This would have been after the person was hired.
Q. Okay. The various items would have been items

that you would have gone over with the individual?

A. Right, right.

Q. Directing your attention back to Defendants' Exhibit 1, this handwriting is not your handwriting?

A. No, no. I'll tell you, it does look very -- no. The answer is no.

Q. You see there is a notation, Defendants' Exhibit 1, there is a notation, LTD; do you see that?

A. Yes.

Q. Do you know what LTD stands for?

A. At the time we had a benefit for long-term disability.

Q. Okay. To the extent you were meeting with a new employee, is that something that would -- strike that. During the hiring process, would the benefit of long-term disability, would that be something that you would discuss with a new employee?

A. Yes. In addition to, I'm going to make a statement here. This handwriting looks extremely familiar. In the payroll department there was a lady named Mary Smith who had very distinctive clear handwriting. This looks like her handwriting. What she would have done with a new employee is she would have gone over the benefits with them in regards to, for example, if you notice here, long-term disability,

that would have been the payment cost. Pay, that's a payroll personnel function.

Q. Just so the record is clear, you're referring in your testimony to Defendants' Exhibit 1, correct?

A. That's correct.

Q. The notation to long term, the features of the long-term disability plan, is that something that you would have discussed with the Plaintiff in this case?

A. Yes.

Q. What would have been, do you recall what you, do you recall what you would have told the Plaintiff regarding the nature of that benefit?

A. I would recall the nature of it, not exactly specifically the words. The nature would have been to explain that the long-term disability benefit would have, A, you had to pay. B, it would have kicked in after the state TDI had paid whatever it was going to pay for a person who was injured or disabled not on the job. I always made a point of that, we always did that, saying if you were injured on the job you would be covered by the workers' compensation company contract, et cetera, et cetera. This was for an injury or illness suffered off the job, TDI would pay. There was a premium that the employee had to pay. Everybody had to. Then the long-term disability was

an additional benefit that kicked in after the TDI.
Q. Other than what you -- have you just summarized for me what you would have told a new employee regarding the nature of the long-term disability benefit?
A. Yes, in a general way, yes.
Q. Is there any other information that you would have given to a new employee regarding the long-term disability benefit, other than what you just summarized for me?
A. For instance?
Q. For instance, would you have said to a new employee that the long-term disability benefit, they should review the terms of the plan to familiarize themselves?
A. Oh, for sure, and there would have been handouts, I think, associated with it.
Q. You would have also given them a copy of the plan?
A. Yes.
Q. And directed the individual to review the terms of the plan to better familiarize themselves with the benefit?
A. Yes, that's correct.
Q. While you don't have a, just so I'm clear,

Mr. Morris, as you sit here today you don't have a specific recollection of having a discussion with Lorraine Femino regarding the long-term disability?

A. Not a specific discussion, no.

Q. If you had had a discussion with her, the discussion would have been along the lines that you just outlined in your testimony to me?

A. It's reasonable to say that for me, yes.

Q. Did you, when you left -- strike that. In connection with the long-term disability benefit, a new employee, if they had elected to receive the benefit, they would have received a copy of the plan, correct?

A. Yes.

Q. Do you know, was there an insurance carrier that provided the benefit?

A. Oh, I'm sure there was a carrier.

Q. Do you remember who that was?

A. No.

Q. The plan document, was that something that you ever reviewed yourself in the course of your job duties?

A. Yes.

Q. Your employment at Hope Webbing ended in approximately 1995?